Opinion
 

 CALLAHAN, J.
 

 Plaintiffs Sheraya Clemente, Rovel Billy Abueg, Brenton Gamer, and the Association for Retarded Citizens—Sonoma County (ARC) sought a writ of administrative mandate (Code Civ. Proc., § 1094.5) and traditional writ of mandate (Code Civ. Proc., § 1085) in Sacramento Superior Court to compel the Department of Developmental Services (DDS), its director, Dennis G. Amundson, and the North Bay Regional Center (NBRC) to set aside a DDS administrative hearing decision authorizing parental copayment for respite services.
 
 [1]
 
 Among other poMs, plaMiffs argued the Legislature did not expressly authorize the copayment in the Lanterman
 
 *1097
 
 Developmental Disabilities Services Act (Welf. & Inst. Code, §§ 4500-4905) (the Lanterman Act).
 
 [2]
 
 They also maintained a DDS policy authorizing other regional centers to establish service standards requiring parental copayment violated the Administrative Procedure Act (Gov. Code, § 11340 et seq.) (APA). The trial court granted other relief sought in plaintiffs’ petition, but denied their challenge to the respite copayment. Plaintiffs appeal.
 

 We conclude NBRC may not impose a parental copayment for respite services in the absence of express statutory authorization. We also conclude DDS may not implement a general policy on respite copayment. Accordingly, we reverse and direct the trial court to: (1) issue a writ of administrative mandate compelling DDS to set aside the administrative hearing decision approving NBRC’s respite copayment; and (2) issue a writ of mandate compelling DDS to cease implementation of its statement authorizing regional centers to establish service standards requiring parental copayment to the extent it applies to respite services.
 

 Background
 

 A.
 
 The Lanterman Act:
 

 The California Legislature enacted the Lanterman Act in 1977 “to prevent or minimize the institutionalization of developmentally disabled persons
 
 [3]
 
 and their dislocation from family and community . . . and to enable them to approximate the pattern of everyday living of nondisabled persons of the same age and to lead more independent and productive lives in the community.”
 
 (Association for Retarded Citizens
 
 v.
 
 Department of Developmental Services
 
 (1985) 38 Cal.3d 384, 388 [211 Cal.Rptr. 758, 696 P.2d 150].) As the administrative law judge (ALJ) observed in this case, the Lanterman Act permitted many individuals previously placed in state hospitals to be housed and effectively treated in less restrictive community settings.
 

 Under the Lanterman Act, “[t]he State of California accepts a responsibility for persons with developmental disabilities and an obligation to them
 
 *1098
 
 which it must discharge.” (§ 4501.) The state also recognizes that “[p]ersons with developmental disabilities have the same legal rights and responsibilities [as those] guaranteed all other individuals by the United States Constitution and laws and the Constitution and laws of the State of California.” (§ 4502.) Statutory rights include “[a] right to treatment and habilitation services and supports in the least restrictive environment” at state expense. (§§ 4502, subd. (a), 4620, 4646-4648; see also
 
 Association for Retarded Citizens
 
 v.
 
 Department of Developmental Services, supra,
 
 38 Cal.3d at p. 389.) The Supreme Court construed the Lanterman Act to grant developmentally disabled persons “the right to be provided at state expense with only such services as are consistent with its purpose.”
 
 (Id.
 
 at p. 393.)
 

 The Lanterman Act authorizes DOS to contract with regional centers such as NBRC to provide developmentally disabled individuals with “access to the services and supports best suited to them throughout their lifetime.” (§ 4620.)
 
 [4]
 
 The regional centers are operated by private nonprofit community agencies.
 
 (Ibid.)
 
 The rights of developmentally disabled persons and the obligations of the state toward them are implemented through individual program plans (IPP) which regional centers must develop for each client. (§§ 4646, 4647;
 
 Association for Retarded Citizens
 
 v.
 
 Department of Developmental Services, supra,
 
 38 Cal.3d at p. 390.)
 

 DOS is authorized to promote uniformity and cost-effectiveness in the operation of regional centers.
 
 (Association for Retarded Citizens
 
 v.
 
 Department of Developmental Services, supra,
 
 38 Cal.3d at p. 389, citing §§ 4631, subd. (a), 4681, and 4780.5.) The responsibility of DOS “does not extend to the control of the manner in which [regional centers] provide services or in general operate their programs.”
 
 (Association for Retarded Citizens
 
 v.
 
 Department of Developmental Services, supra,
 
 at pp. 389-390.)
 

 
 *1099
 
 In 1992, the Legislature enacted section 4791 in response to the state’s “unprecedented fiscal crisis.” (Stats. 1992, ch. 722, § 27, p. 3371, eff. Sept. 15, 1992.) The new statute required regional centers to submit to DDS detailed plans for absorbing anticipated unallocated budget reductions.
 
 (Ibid.)
 
 Relevant to this appeal are two subdivisions of the 1992 version of section 4791:
 

 “(c) To carry out the intent of this provision, . . . each regional center contract shall include provisions which ensure the regional center will provide services to eligible consumers within the funds available in the contract throughout the contract term. Regional centers shall implement innovative, cost-effective methods of services delivery, which may include, but not be limited to, the use of vouchers, consumer or parent services coordinators, increased administrative efficiencies, and
 
 alternative sources of payment for services.”
 
 (Italics added.)
 

 “(h)(1) The plan submitted to the department may include, but not be limited to:
 

 “(A) Innovative and cost-effective methods of services delivery that include, but are not limited to, the use of vouchers; the use of consumers and parents as service coordinators; alternative methods of case management; the use of volunteer teams, made up of consumers, parents, other family members, and advocates, to conduct the monitoring activities described in Section 4648.1; increased administrative efficiencies; alternative sources of payment for services; use of available assessments in determining eligibility; and alternative nonresidential rate methodologies or service delivery models, or both.
 
 In addition, the regional center shall take into account, in identifying the consumer’s service needs, the family’s responsibility for providing similar services to a child without disabilities.”
 
 (Stats. 1992, ch. 722, § 27, italics added.)
 
 [5]
 

 B.
 
 NBRC’s Expenditure Plan:
 

 In December 1994, DDS approved NBRC’s expenditure plan for fiscal year 1994-1995.
 
 [6]
 
 The plan merged various services under one title or
 
 *1100
 
 category. It provided respite services under the title of “day care,” differentiating between “day care for relief’ and “day care for work and educational purposes.”
 
 [7]
 

 NBRC informed parents and family members of its clients that beginning March 1,1995, families receiving respite care for children under 13 years of age would be expected to pay the regular cost of child care at the rate of $3 per hour. NBRC made clear it would pay a greater portion of the day care costs if “a family [could] demonstrate a financial need, and when not doing so [would] jeopardize the family’s ability to keep a child at home, . . It mailed families a follow-up letter on March 28, 1995, which clarified that the copayment applied to services previously called respite care. The letter also explained the procedure for requesting a fair hearing in the event families disagreed with the amount of copayment set by NBRC.
 

 C.
 
 The Plaintiffs:
 

 Individual plaintiffs Sheraya Clemente, Rovel Billy Abueg, and Brenton Gardner are developmentally disabled children who are clients of NBRC. Their families are eligible to receive respite services.
 

 At the time of the administrative hearing, Sheraya Clemente was 5 years old, but functioned at the developmental level of an 18-to-22-month-old. If left unattended, Sheraya would walk out the front door and down the street. She frequently wandered around the house and pulled down unattached objects. Sheraya scattered household items, leaving silverware in her parents’ bed and toilet paper in the shower. She did not respond to behavior approaches that worked with a nondisabled child.
 

 Sheraya’s IPP authorized her family to receive 96 hours of respite services each quarter. The Clementes used respite to complete household tasks such as cooking, cleaning, shopping, yard work, and maintenance.
 

 Billy Abueg is autistic, hyperactive, and suffers severe mental disabilities. He was nearly 12 years old at the time of the administrative hearing. Billy could not talk and was not toilet trained. His destructive and disruptive behavior required 24-hour supervision by people with the physical ability to control him.
 

 Billy’s IPP authorized 116 hours of respite services in the first quarter of 1995, and 92 hours of respite services in the second quarter. His parents used
 
 *1101
 
 respite to attend church, or go out to dinner or a movie with their older, nondisabled son. Sometimes they attended the older son’s piano recitals and school programs.
 

 Brenton Gardner has Down’s syndrome. He was two and a half years old at the time of the hearing. Brenton was hard to control. He had temper tantrums because he could not communicate. His mother had to carry him everywhere.
 

 Brenton’s mother requested continuation of the 75 hours of respite services per quarter. She used respite to run errands, attend meetings and support groups, and spend time with her older son.
 

 D.
 
 The Administrative Hearing:
 

 The individual plaintiffs appealed NBRC’s denial of their claim the co-payment for respite services violated the Lanterman Act. At the DDS administrative hearing, the ALJ found that “even in those circumstances that warrant the provision of Respite Care services, because the parents and family simply must get away from the demands of the client, the service being provided in some portion contains identical care strategies and methods as will be employed in any Child Care service of children that are not developmentally disabled.” Citing the last sentence in former section 4791, subdivision (h)(1)(A), the ALJ concluded NBRC was authorized to charge a copayment for that portion of respite care.
 
 [8]
 

 E.
 
 Plaintiffs’ Superior Court Petition:
 

 ARC joined the individual plaintiffs in seeking relief in superior court. They sought a writ of administrative mandate to reverse the ALJ’s decision on grounds DDS did not proceed in the manner required by law. Plaintiffs also alleged three causes of action in their petition for traditional writ of mandate. The first cause of action alleged DDS, Amundson, and NBRC breached their ministerial duty to assure NBRC complied with the Lanterman Act. The third cause of action alleged DDS and Amundson issued a policy authorizing copayment for services “similar to a service a child without a disability would need” in violation of the APA.
 

 The court affirmed the ALJ’s decision to approve NBRC’s copayment for respite services, stating that “[wjhile the Lanterman Act does not explicitly
 
 *1102
 
 authorize the imposition of the co-pay, neither does it expressly prohibit it.” It ruled the DDS policy did not constitute an underground regulation. The court also granted DOS’s, Amundson’s, and NBRC’s motions to strike exhibits A and B, two ALJ decisions which found the Lanterman Act did not authorize copayments for respite services.
 
 [9]
 
 This appeal ensued.
 

 Discussion
 

 I
 

 The Lanterman Act Does Not Authorize Copayment for Respite Care
 

 Under Code of Civil Procedure section 1094.5, the inquiry focuses on “whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.” (Code Civ. Proc., § 1094.5, subd. (b).) Plaintiffs’ petition for writ of administrative mandate alleges the adverse DDS administrative decision constituted a prejudicial abuse of discretion because the ALJ did not proceed in the manner required by law, that is, he wrongly concluded the Lanterman Act authorized a copayment for respite services.
 

 “[W]e independently determine the proper interpretation of the statute. As the matter is a question of law, we are not bound by evidence on the question presented below or by the lower court’s interpretation.”
 
 (Burden
 
 v.
 
 Snowden
 
 (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672];
 
 California Teachers Assn.
 
 v.
 
 San Diego Community College Dist.
 
 (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856].)
 

 The rules governing statutory interpretation are well established. “We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent.”
 
 (Burden
 
 v.
 
 Snowden, supra,
 
 2 Cal.4th at p. 562.) To determine intent, we look first to the language of the statute.
 
 (Ibid.)
 
 Specific statutes must be construed with reference to the entire system of law of which they are a part, so that all may be harmonized and have effect.
 
 (American Federation of State etc. Employees
 
 v.
 
 County of San Diego
 
 (1992) 11 Cal.App.4th 506, 515 [14 Cal.Rptr.2d 51].) We are also mindful that remedial statutes such as the Lanterman Act must be liberally construed to effectuate the purposes for which they were enacted.
 
 (California State Restaurant Assn.
 
 v.
 
 Whitlow
 
 (1976) 58 Cal.App.3d 340, 347 [129 Cal.Rptr. 824].)
 

 
 *1103
 
 As we explained, an overriding purpose of the Lanterman Act is to enable developmentally disabled individuals to live in the least restrictive environment possible. (§ 4502, subd. (a).) The state has accepted its obligation to pay for support services such as respite care regardless of the parents’ financial status as a statutory entitlement—unless the Legislature has created an exception to that policy.
 
 (Ibid:,
 
 see also §§ 4620, 4646-4648.) Plaintiffs argue respite services advance this legislative purpose by providing families with the support necessary to care for their developmentally disabled children at home and should not be conditioned on copayment without express statutory authorization. We agree with plaintiffs’ argument.
 

 Although the state “accepts a responsibility” for persons with developmental disabilities (§ 4501) and pays for the bulk of their “treatment and habilitation services and supports” (§§ 4502, subd. (a), 4620, 4646-4648), the parties acknowledge the Legislature did not intend that the state assume the entire cost of services where families have the ability to pay. They cite three sections of the Lanterman Act where the Legislature expressly authorized the imposition of copayments on the families of developmentally disabled individuals.
 

 Former sections 4850 and 4851 assessed families a fee for management services under a sliding scale for the purpose of obtaining federal funds for those services. (Stats. 1991, ch. 14, § 1, pp. 81-84.) At the same time, the Legislature stated it intended that DDS “continue to pursue all available administrative and judicial remedies for obtaining federal financial participation for case management services without the imposition of user fees.”
 
 (Id.
 
 at p. 82.) Sections 4850 and 4851 were repealed in 1996 in accordance with former section 4854. (Stats. 1991, ch. 14, § 1, p. 87.)
 

 Section 4782 states that parents of children under the age of 18 who receive 24-hour out-of-home care through a regional center “shall be required to pay a fee depending upon their ability to pay, but not to exceed (1) the cost of caring for a normal child at home, as determined by the Director of Developmental Services, or (2) the cost of services provided, whichever is less.”
 

 The Legislature amended section 4685 in 1992 to impose—for the first time—a parental copayment for day care services: “When purchasing or providing a voucher for day care services for parents who are caring for children at home, the regional center may pay only the cost of the day care service that exceeds the cost of providing day care services to a child without disabilities. The regional center may pay in excess of this amount when a family can demonstrate a financial need and when doing so will enable the child to remain in the family home.” (§ 4685, subd. (c)(6).)
 

 
 *1104
 
 Indeed, the language and structure of section 4685 assist in our effort to determine the Legislature’s intent on the question of copayment for respite. The statute specifically addresses home services. It begins with the statement that “ [consistent with state and federal law, the Legislature finds and declares that children with developmental disabilities most often have greater opportunities for educational and social growth when they live with their families. The Legislature further finds and declares that the cost of providing necessary services and supports which enable a child with developmental disabilities to live at home is typically equal to or lower than the cost of providing out-of-home placement. The Legislature places a high priority on providing opportunities for children with developmental disabilities to live with their families, when living at home is the preferred objective in the child’s individual program plan.” (§ 4685, subd. (a).) Section 4685, subdivision (c)(2) states that “[rjegional centers shall consider every possible way to assist families in maintaining their children at home, when living at home will be in the best interest of the child, before considering out-of-home placement alternatives. When the regional center first becomes aware that a family is considering out-of-home placement, the regional center shall meet with the family to discuss the situation and the family’s current needs, solicit from the family what supports would be necessary to maintain the child in the home, and utilize creative and innovative ways of meeting the family’s needs and providing adequate supports to keep the family together, if possible.”
 

 Section 4685 then focuses on the specific services and supports which enable developmentally disabled children to remain at home. Respite for parents and day care are listed
 
 separately
 
 among the types of assistance available through regional centers. (§ 4685, subd. (c)(1).)
 

 DOS and NBRC argue that because child care is a component of both day care and respite, it is the same activity. The Lanterman Act expressly defines respite services. (§ 4690.2, see fn. 1
 
 ante,
 
 p. 1096.) It does not define day care.
 
 [10]
 
 However, when NBRC improperly merged the categories of respite and day care in its 1994-1995 expenditure plan, it retained the distinction between respite or “day care for relief’ and “day care for work and educational purposes.” We believe the separate listing of respite for parents and day care in section 4685, subdivision (c)(1), as well as the distinction made by NBRC, acknowledge that respite and day care are qualitatively different. Respite services provide the relief necessary for families to cope with the
 
 *1105
 
 stress of caring for developmentally disabled children at home 24 hours a day. (§ 4690.2, subd. (a)(3).) The focus is not on what families elect to do when respite services are provided, but on the fact they are relieved from the responsibility of caring for their developmentally disabled child during that period. (See § 4690.2.) The children benefit from the family setting, and the state benefits from the generally lower cost of home care. (§ 4685, subd. (a).)
 
 [11]
 
 We therefore reject NBRC’s argument that respite is simply “additional child care.”
 

 More important for purposes of statutory construction is the fact section 4685 identifies respite and day care as separate types of assistance available to families caring for developmentally disabled children at home, but expressly authorizes parental copayment
 
 only
 
 for day care. Had the Legislature intended to assess a copayment for respite services it had every opportunity to do so in the 1992 amendment which added copayment for day care.
 
 [12]
 

 The legislative history of sections 4782 and 4685 demonstrates the Legislature’s intent to limit the exceptions to entitlements under the Lanterman Act. Before 1984, the language of section 4782 did not clearly limit parental copayments to 24-hour out-of-home care provided through regional centers or state hospitals. Regional centers were charged with determining the amount of what the statute described as parental “contributions.” (Stats. 1977, ch. 1252, § 550, pp. 4520, 4560; Stats. 1978, ch. 948, § 1, p. 2929.) There was no uniformity in the way the regional centers applied the statute. Although DDS regulations construed the contributions as
 
 required
 
 fees, some regional centers and many parents concluded they were
 
 voluntary.
 
 (Sen. Com. on Health & Welfare, Dept. of Developmental Services, Request for Approval of Sen. Bill No. 2310 (1983-1984 Reg. Sess.) as revised Nov. 14, 1984, pp. 1-2, 4.) At the urging of DDS, the Legislature amended the statute changing the “contribution” to a “fee,” giving DDS responsibility for fee assessment, and limiting the fee to 24-hour out-of-home care for minors.
 
 (Ibid.;
 
 Dept. of Developmental Services, Analysis of Sen. Bill No. 2310 (1983-1984 Reg. Sess.) p. 2; Stats. 1984, ch. 268, § 36.6, pp. 1374-1375.)
 

 
 *1106
 
 The Legislature amended section 4685 in direct response to The Next Step, a comprehensive legislative report of 1990 hearings on the Lanterman Act. (See Assem. Com. on Health, Staff Analysis of Sen. Bill No. 1383 (1991-1992 Reg. Sess.) June 30, 1992, pp. 3-4.) The report expressed concern that 1990-1991 budget proposals, which included parental fees, “[might] be attempts to restrict the Lanterman Act’s guarantee of least restrictive services, promotion of independence and guarantee of entitlements.” (The Next Step,
 
 supra,
 
 at p. 207.) It cited efforts by DDS to establish parental fees for case-management services in order to obtain federal Medicaid dollars, and urged rejection of copayments for that purpose.
 
 (Id.
 
 at pp. 206-207, 214.) The proposed amendments to section 4685 included copayments for both day care and diaper costs. (Assem. Com. on Health, Staff Analysis of Sen. Bill No. 1383 (1991-1992 Reg. Sess.) June 30, 1992 p. 2; Assem. Com. on Ways and Means, Staff Analysis of Sen. Bill No. 1383 (1991-1992 Reg. Sess.) Aug. 5, 1992, pp. 2-3.) However, the actual amendment to section 4685 limited the parental copayment for diapers to children under three years of age. Moreover, regional centers continue to pay for diapers for those children when the family demonstrates financial need and “when doing so [would] enable the child to remain in the family home.” (Stats. 1992, ch. 1011, §21, p. 4731.)
 

 Also revealing of intent is the fact the Legislature considered legislation amending section 4685 at the same time it considered legislation which added section 4791—the statute which required the regional centers to submit cost-cutting plans in response to the state’s fiscal crisis. (Sen. Bill No. 485, 1 Sen. Final Hist. (1991-1992 Reg. Sess.) pp. 381-382; Sen. Bill No. 1383, 2 Sen. Final Hist. (1991-1992 Reg. Sess.) p. 1000.) We assume the Legislature was aware of the state’s money woes, and nonetheless elected not to impose a copayment for respite services when it amended section 4685.
 

 We turn now to the language in section 4791, subdivision (c) and former subdivision (h)(3)(A) which DDS and NBRC argue authorize respite copayment. The vague language of the Legislature’s directive in section 4791, subdivision (c) that regional centers seek “alternative sources of payment for services” cannot be read to authorize copayment for respite services. Under the DDS and NBRC analysis, there would be no limit on the type or number of services for which a regional center could impose copayment. Such an interpretation is contrary to the remedial purpose of the Lanterman Act to provide at state expense a broad spectrum of treatment, habilitation and supports to enable developmentally disabled individuals to live in the least restrictive environment possible.
 

 The legislative history also supports a narrow reading of section 4791, subdivision (c). Section 4791 was enacted as part of a budget trailer bill
 
 *1107
 
 which focused on the identification of Medi-Cal related savings. (Assem. Staff Analysis, Sen. Bill No. 485 (1991-1992 Reg. Sess.) pp. 1, 5-6.)
 
 The Next Step
 
 had already outlined possible sources of federal funding to reduce caseloads and expand current levels of service to the developmentally disabled. It also cautioned that efforts to obtain federal funding be consistent with service philosophies embodied in the Lanterman Act. (The Next Step, supra, pp. 219, 221-222.) In this context, the phrase “alternative sources of payment for services” cannot be read as authorizing copayments for respite services.
 

 We also reject DOS’s and NBRC’s interpretation of the last sentence in former section 4791, subdivision (h)(1)(A)—in which DDS directs the regional centers to “take into account, in
 
 identifying the consumer’s service needs,
 
 the family’s responsibility for providing similar services to a child without disabilities.” (Italics added.) The main part of subdivision (h)(1)(A) lists possible “[ijnnovative and cost-effective methods of services delivery.” The plain language of the last sentence refers to the regional center’s process of identifying service needs, that is, the development of the IPP. (See §§ 4646-4648.) We have difficulty extrapolating that directive to include imposition of a copayment for respite services, particularly where copayment for another type of home support—day care—is expressly authorized in section 4685, subdivision (c)(6).
 
 [13]
 

 Based on the foregoing, we conclude DDS did not proceed in the manner required by law when it denied plaintiffs’ challenge to NBRC’s copayment for respite services.
 

 n
 

 DDS May Not Implement Its “Caveat” on Respite Copayment
 

 Plaintiffs’ petition alleges that on October 27, 1995, DDS and Amundson “issued a policy which authorizes regional centers to establish service standards requiring a parental copay for any service purchased for the minor or the minor’s family if that service is similar to a service a child without a disability would need.”
 
 [14]
 
 They assert the policy is a “rule of general applicability that is used to implement, interpret or make specific the provisions
 
 *1108
 
 of the Lanterman Act and the rights of regional center clients” and therefore subject to the APA. (Gov. Code, § 11342, subd. (g);
 
 Winzler & Kelly
 
 v.
 
 Department of Industrial Relations
 
 (1981) 121 Cal.App.3d 120,125-126 [174 Cal.Rptr. 744].) DDS characterizes the statement as merely a “caveat” to ensure regional centers adhere to statutory authority if they choose to implement a copayment for respite services.
 

 We need not reach the question whether the so-called “caveat” is an underground regulation issued in violation of the APA. Having concluded the Legislature did not authorize imposition of copayment for respite services, we also conclude the DDS statement—by whatever name—is an incorrect statement of the law. Accordingly, DDS and Amundson breached their ministerial duties by implementing it.
 

 Disposition
 

 The judgment is reversed. The trial court is ordered to: (1) issue a writ of administrative mandate compelling DDS to set aside the administrative hearing decision approving NBRC’s copayment for respite services; and (2) issue a writ of mandate compelling Amundson and DDS to cease implementation of the statement authorizing regional centers to establish service standards requiring parental copayment to the extent it applies to respite services. Plaintiffs shall receive costs on appeal.
 

 Puglia, P. J., and Davis, J., concurred.
 

 [1]
 

 Welfare and Institutions Code section 4690.2, subdivision (a) defines respite services as follows:
 

 “ ‘In-home respite services’ means intermittent or regularly scheduled temporary nonmedical care and supervision provided in the client’s own home, for a regional center client who resides with a family member. These services are designed to do all of the following:
 

 “(1) Assist family members in maintaining the client at home.
 

 “(2) Provide appropriate care and supervision to ensure the client’s safety in the absence of family members.
 

 “(3) Relieve family members from the constantly demanding responsibility of caring for the client.
 

 “(4) Attend to the client’s basic self-help needs and other activities of daily living including interaction, socialization, and continuation of usual daily routines which would ordinarily be performed by the family members.”
 

 [2]
 

 All undesignated statutory references are to the Welfare and Institutions Code.
 

 [3]
 

 Section 4512, subdivision (a) defines “developmental disability” as “a disability which originates before an individual attains age 18, continues, or can be expected to continue, indefinitely, and constitutes a substantial disability for that individual. As defined by the Director of Developmental Services, in consultation with the Superintendent of Public Instruction, this term shall include mental retardation, cerebral palsy, epilepsy, and autism. This term shall also include disabling conditions found to be closely related to mental retardation or to require treatment similar to that required for mentally retarded individuals, but shall not include other handicapping conditions that are solely physical in nature.”
 

 [4]
 

 Section 4512, subdivision (b) defines “services and supports” as “specialized services and supports or special adaptations of generic services and supports directed toward the alleviation of a developmental disability or toward the social, personal, physical, or economic habilitation or rehabilitation of an individual with a developmental disability, or toward the achievement and maintenance of independent, productive, normal lives. The determination of which services and supports are necessary for each consumer shall be made through the individual program plan process. The determination shall be made on the basis of the needs and preferences of the consumer or, when appropriate, the consumer’s family, and shall include consideration of a range of service options proposed by individual program plan participants, the effectiveness of each option in meeting the goals stated in the individual program plan, and the cost-effectiveness of each option. Services and supports listed in the individual program plan may include, but are not limited to, . . . day care, . . .
 
 respite-, . . .
 
 Nothing in this subdivision is intended to expand or authorize a new or different service or support for any consumer unless that service or support is contained in his or her individual program plan.” (Italics added.)
 

 [5]
 

 The 1996 amendments to section 4791 renumbered subdivision (h)(1)(A) as (e)(3)(A). To avoid confusion, we cite the subdivision as it appeared in the 1992 legislation, the only version of section 4791 at issue in this appeal. We reject as irrelevant arguments on the significance of the 1996 amendments to section 4791.
 

 [6]
 

 Evidence and argument on NBRC’s current financial status are not properly before us.
 
 (Kendall
 
 v.
 
 Barker
 
 (1988) 197 Cal.App.3d 619, 625 [243 Cal.Rptr. 42];
 
 Pulver
 
 v.
 
 Avco Financial Services
 
 (1986) 182 Cal.App.3d 622, 632 [227 Cal.Rptr. 491].)
 

 [7]
 

 The ALJ found the two services had been “inappropriately merged,” and voided that portion of NBRC’s plan.
 

 [8]
 

 As we stated, that sentence reads: “[T]he regional center shall take into account, in identifying the consumer’s service needs, the family’s responsibility for providing similar services to a child without disabilities."
 

 [9]
 

 Plaintiffs prevailed on their claim NBRC could not impose a copayment on clients under the age of three who received services under the Early Intervention Services Act.
 

 [10]
 

 A 1991 legislative study of the Lanterman Act refers to day care as “necessary for parents who must work in order to keep their child with developmental disabilities at home.” (Sen. Subcom. on Mental Health, Developmental Disabilities, and Genetic Diseases et al., The Next Step: Empowering California’s Developmental Disabilities Community (Jan. 1991) Summary of Public Recommendations, p. 133 (The Next Step).)
 

 [11]
 

 Although there is no evidence that the imposition of the copayment created a disincentive for these plaintiffs to use respite services, the executive director of NBRC raised that possibility in her testimony before the ALJ. She stated that the modest savings achieved under the plan in the current year “doesn’t take into consideration the possibility of families considering reduced usage because they would be, perhaps, considered—they would use their respite more considerately.” DDS suggests the remark shows NBRC “realized that the respite copayment might influence families to request the amount of respite services they actually need.”
 

 [12]
 

 The record suggests NBRC understood copayment was available for day care, but not respite services. Its elimination of respite services and unauthorized reclassification of those services as “day care for relief’ appear to be a poorly disguised effort to expand the services subject to parental copayment.
 

 [13]
 

 Given our resolution of this issue, we need not address the question whether the court abused its discretion in denying the request for judicial notice of other DDS administrative hearing decisions.
 

 [14]
 

 The DDS statement reads in full: “Regional centers may establish a service standard requirement for parental co-pay for any service it purchases for a minor or the minor’s family if that service is similar to a service for a child without a disability. However, the following factors, at minimum, must be considered when determining the co-pay amount: consumer age,
 
 *1108
 
 ability to pay (e.g., number of dependents in family, severity of consumer’s disability, financial hardship, the family’s current financial contribution to the care of the consumer), full extent of service need (e.g., total number of hours required or currently received), and availability of natural supports. A co-payment may be required for respite services which can be demonstrated to be similar to services that would be purchased by a family for a child without a developmental disability.”