[No. B211710. Second Dist., Div. One. June 25, 2010.]

SAMANTHA C., Plaintiff and Appellant, v.
STATE DEPARTMENT OF DEVELOPMENTAL SERVICES et al.,
Defendants and Respondents.

1464

1466

COUNSEL

Beltran, Beltran, Smith, Oppel & MacKenzie and Thomas E. Beltran for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, Douglas M. Press, Assistant Attorney General, Richard T. Waldow and Julie T. Trinh, Deputy Attorneys General, for Defendants and Respondents State Department of Developmental Services and Terri Delgadillo.

Michelman & Robinson, Mona Z. Hanna and Robin James for Defendant and Respondent Harbor Regional Center.

## OPINION

**MALLANO, P. J.**—Samantha C. appeals from a judgment denying her petition for a writ of mandate and her request for declaratory relief. She seeks to overturn determinations by defendants Harbor Regional Center (HRC) and the State Department of Developmental Services (DDS) that she did not have a developmental disability and was therefore not entitled to services under the Lanterman Developmental Disabilities Services Act (Lanterman Act). (Welf. & Inst. Code, § 4500 et seq.)[1] Section 4512(a) includes within the definition of developmental disability: mental retardation, cerebral palsy, epilepsy, autism, and disabling conditions closely related to, or requiring similar treatment to, mental retardation. Samantha also seeks to reverse the trial court's determination upholding the validity of provisions of section 54000, subdivision (c) of title 17 of the California Code of Regulations (regulation 54000(c)).[2]

■ We affirm that part of the judgment upholding the validity of the regulations because they are consistent with section 4512(a). But we reverse the trial court's determination that Samantha does not have a developmental disability under the Lanterman Act because Samantha has a disabling condition related to her birth injuries which requires "treatment similar to that required for individuals with mental retardation," within the meaning of that part of section 4512(a) known as the fifth category.

---

[1] Unspecified statutory references are to the Welfare and Institutions Code.

Section 4512, subdivision (a) (section 4512(a)) provides: " 'Developmental disability' means a disability that originates before an individual attains age 18 years, continues, or can be expected to continue, indefinitely, and constitutes a substantial disability for that individual. As defined by the Director of Developmental Services, in consultation with the Superintendent of Public Instruction, this term shall include mental retardation, cerebral palsy, epilepsy, and autism. *This term shall also include disabling conditions found to be closely related to mental retardation or to require treatment similar to that required for individuals with mental retardation, but shall not include other handicapping conditions that are solely physical in nature.*" (Italics added.) The italicized sentence describes a category of eligibility for services known as the "fifth category." (*Mason v. Office of Admin. Hearings* (2001) 89 Cal.App.4th 1119, 1122 [108 Cal.Rptr.2d 102] (*Mason*).)

[2] The pertinent provisions of regulation 54000(c) are paragraphs (1) and (2): "Developmental Disability shall not include handicapping conditions that are: [¶] (1) Solely psychiatric disorders where there is impaired intellectual or social functioning which originated as a result of the psychiatric disorder or treatment given for such a disorder. Such psychiatric disorders include psycho-social deprivation and/or psychosis, severe neurosis or personality disorders even where social and intellectual functioning have become seriously impaired as an integral manifestation of the disorder. [¶] (2) Solely learning disabilities. A learning disability is a condition which manifests as a significant discrepancy between estimated cognitive potential and actual level of educational performance and which is not a result of generalized mental retardation, educational or psycho-social deprivation, psychiatric disorder, or sensory loss." (Reg. 54000(c)(1), (2).)

## BACKGROUND

### A. *Birth and Family Background*

Samantha was born two and one-half months prematurely in June 1983 in Austria. According to Samantha's mother, Samantha was born severely underweight and with hypoxia (oxygen deprivation). She was administered oxygen for about a week after birth. At the time of Samantha's birth, doctors told Samantha's mother that Samantha had been deprived of oxygen for about 30 minutes and that oxygen deprivation can cause brain damage and problems with eyesight. Samantha also suffered hip dysplasia at birth, causing her lifelong gait and balance problems. Samantha's father was diagnosed with bipolar disorder and had a psychiatric hospitalization; an aunt of Samantha had a history of schizophrenia. There was domestic violence in the family home; Samantha claimed that there was "constant bickering."

According to Samantha's mother, Samantha exhibited behavioral problems beginning at age two, with prolonged temper tantrums. In school, where Samantha was always in special education classes, her behavior was "generally overly-active, but controllable." School psychologists who tested Samantha told Samantha's parents that oxygen deprivation at birth caused a "developmental disability in [Samantha's] brain," which caused visual and auditory processing problems.

Samantha attended kindergarten in Long Beach, California. A 1989 psychological assessment by the Long Beach Unified School District noted that Samantha was diagnosed with " '[m]oderate to moderately severe auditory attending and memory deficit, mild-moderate pragmatic language deficit, mild speech impairment.' " Samantha qualified for special education services even though she appeared to be functioning within the "average range of cognitive ability" because her academic achievement in reading, mathematics, and written language was significantly below her indicated level of ability ascertained through testing.

In 1990, the family moved to Canada. Samantha became upset when she learned the family was intending to move, and she was hospitalized for depression. A Canadian school neurocognitive assessment report in 1993 stated that Samantha repeated the first grade; she was then in a grade three placement, but was reading at a grade two level, writing at a grade one level, and her arithmetic skills were at a beginning grade three level. On the Wechsler Intelligence Scale for Children, third edition, her intellectual/cognitive abilities were assessed in the low average range.

In 1994, the family returned to Long Beach, where Samantha enrolled in the fourth grade. When Samantha was 11 years old, a psychiatrist prescribed

Cylert for attention deficit disorder (ADD), and her parents and teacher noticed significant improvement in her condition for a few weeks, but the beneficial effects of the medication tapered off and her parents discontinued the medication.

The family moved to North Carolina, where Samantha attended several different high schools. According to Samantha's father, Samantha did not get as much help as she needed from the schools in North Carolina. Samantha's paternal aunt, Carol C., promised Samantha that she could live with her in Southern California if Samantha graduated from high school. Samantha wanted to move away from home because she felt her parents did not understand her, her brothers bullied her, and her sister was too bossy. While in high school, Samantha had a series of low-level jobs, with supervision by family members. She worked as a dishwasher and server in restaurants; she had an internship and part-time job in a hotel. None of the jobs lasted longer than about nine or 10 months. Samantha had difficulty getting along with people in the workplace and did not show up for work consistently.

Samantha earned grades of "A" through "D" in high school, and she claimed to have taken the math exit exam more than nine times before cheating in order to pass the test so she could live with Carol C. Immediately after obtaining her high school diploma in North Carolina, Samantha moved to California to live with Carol C.

Carol C. enrolled Samantha in several classes at Long Beach City College. She had difficulty with reading and writing, and testing in March 2003 revealed algebra readiness scores in the 18th percentile. Samantha claimed not to have remembered anything after two years of attending college. For four months in 2004, Samantha received tutoring from the Sylvan Learning Center in basic writing and math skills, but made no progress. Samantha's total math skills were at the fourth grade level; her vocabulary was at the 10th grade level; and reading comprehension was at the ninth grade level. According to Carol C., Samantha took a cake decorating class but could not follow written instructions or pay attention; Samantha did not understand measurement concepts. Samantha had no friends her own age; "[s]he can only really relate to people that are older because they spot [her] disability and they just give her a break."

Samantha applied for and was approved for SSI (supplemental security income) disability benefits, as well as benefits from the State Department of Health Services. With the assistance of her aunt, Samantha applied for HRC services in 2004. HRC denied Samantha's request for eligibility in July 2004, so Samantha reapplied for services in 2006, which application was also

denied. In August 2006, Samantha requested a hearing before an administrative law judge (ALJ) to contest HRC's denial of services. An administrative hearing was held over the course of several days from October 2006 through May 2007.

In the meantime, Samantha was evaluated by numerous professionals, whose reports were admitted into evidence at the administrative hearing and are discussed below. In November 2005, Samantha also qualified for services from California's Department of Rehabilitation (DOR), with qualifying diagnoses of hip dysplasia, learning disorder, ADD, attention deficit/hyperactivity disorder (ADHD), and possible personality disorder. The DOR concluded that Samantha had the potential for selective competitive employment with a supportive employer, but she would need a sheltered workshop as a first step in her vocational rehabilitation. Through DOR, Samantha was eligible for an academic tutor, a mobility trainer, a job developer, and a job coach.

In 2006, Samantha attended child development classes through a regional occupational program and was interning at a preschool. In 2005, Samantha began taking Adderall, and for a while the medication helped her to focus on her classes. In August 2006, Samantha told her physician, Maureen Saunders, M.D., that she was pleased with her accomplishments, but in September 2006, Samantha reported that she was forgetful again and was frustrated with her inability to keep up with her classwork. By December 2006, Samantha was attending her classes and completing her classwork. According to Carol C., when Samantha was not taking her ADD medication, "she literally behaves like a slug. She doesn't get out of bed . . . . She doesn't actually hear what you're saying to her."

B. *Expert Evaluations*

1. *Armando de Armas, Ph.D.*

HRC referred Samantha to psychologist Armando de Armas, Ph.D., who conducted an evaluation of her in June 2004. De Armas reported that Samantha, who was then 21 years old, was concerned because she was disorganized, had difficulty concentrating, and was not able to remember anything she learned; she spent most of her day watching television and staying at home; she wanted to learn to read a bus schedule, to drive a car, to manage money, and to live independently. De Armas noted that Samantha's communication and language skills were good, although she had difficulty with working memory, particularly with arithmetic and numbers during the testing. He saw no indication of a developmental delay during his interview.

De Armas administered the Wechsler Adult Intelligence Scale, third edition (WAIS-III) and the Vineland Adaptive Behavior Scales tests (Vineland tests).

On the two WAIS-III subtests (verbal and performance), Samantha obtained scores of 92 and 87, respectively, yielding a full-scale IQ score of 90, placing her cognitive functioning in the average range. The Vineland tests, which measure personal and social skills in performing daily activities in four areas (communication, daily living skills, socialization, and motor skills) revealed that Samantha functioned adequately in the areas of daily living skills and socialization but functioned on a moderately low level in the area of communication.

According to de Armas, Samantha's global assessment function (GAF) was 70 (with a GAF below 50 indicating significant impairment). De Armas determined that Samantha exhibited no indication of autistic spectrum disorder, but he referred her for a neuropsychological evaluation to consider ADHD. It was on the basis of de Armas's evaluation that HRC determined in 2004 that Samantha was not eligible for services.

### 2. *Terrance W. Dushenko, Ph.D.*

Neuropsychologist Terrance W. Dushenko, Ph.D., performed a neuropsychological evaluation of Samantha in December 2004 and January 2005. In his February 2005 report, Dushenko diagnosed Samantha with (1) ADHD, which affected her working memory and processing speed, and (2) a learning disability NOS (not otherwise specified) involving mathematics, written expression and expressive language. Dushenko also believed that the foregoing two diagnoses were "predominantly subsumed" under a tentative diagnosis of pervasive developmental disability (PDD). His report stated that "it appears highly likely that the patient's ADD and other learning disorders are a consequence of this developmental disorder [(PDD)] that appears to most likely have stemmed from a hypoxic birth episode." But Dushenko also admitted that "at the present time . . . PDD is predominantly diagnosed when patients are substantially more overtly impaired than [Samantha] is. However, the nature and overall extent of her deficits suggest this to be the most likely diagnosis." Dushenko also diagnosed dysthymia (low-level depression).

Dushenko administered to Samantha the WAIS-III test, which revealed her cognitive function was within the average range; her full-scale IQ was 99, which is the 47th percentile. On the Wechsler Memory Scale, third edition (WMS-III), Samantha performed within normal limits, but the working memory subtests placed her in the 4th percentile and was "by far her worst overall skill." Samantha had capability in visual examination and recall, but she performed much less effectively on tasks requiring her to remember verbal details and her long-term memory base had significant gaps. Thus, although Samantha had substantial difficulties in certain areas of memory, she also had particular strengths. Dushenko believed that Samantha would benefit from the presentation of information both visually and verbally.

According to Dushenko, Samantha's GAF was 45, as she "demonstrates major impairment in family relations, school, work, interpersonal relations in general, along with decreased judgment, thinking and mood." Samantha appeared to Dushenko to be moderately depressed and anxious; she admitted to him that she had a fear of not succeeding in life. Dushenko recommended medication for ADHD and a variety of therapy and support options, including attendance at a learning center for learning disabilities and a young adult camp or residential living environment where Samantha could learn and work. Dushenko also testified that Samantha would benefit from some of the same *services* needed by persons with mental retardation, but she would need different kinds of specialists to provide cognitive rehabilitation and training.

### 3. *Rita S. Eagle, Ph.D.*

When Samantha reapplied for services with HRC in 2006, HRC referred her for an assessment by clinical psychologist Rita S. Eagle, Ph.D., who focused her career on developmental disabilities, mental retardation, and autism. Eagle evaluated Samantha in April and May 2006 and prepared a written report in June 2006. Because Dushenko had recently tested Samantha's cognitive functioning, she did not do so.

Using Dushenko's WAIS-III test results for cognitive function, Eagle determined that Samantha did not meet the criteria for mental retardation. According to the criteria set out in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) (DSM-IV-TR), criteria used by HRC, a full-scale IQ of 70 or below is one of the criteria for mental retardation; a full-scale IQ of between 70 and the low 80's is considered borderline; an IQ of between 80 and 90 is low average; and an IQ between 90 and 110 is average. Samantha scored above average in the areas of abstract reasoning and conceptual development and had good scores in vocabulary and comprehension; she performed poorly on subtests involving working memory and processing speed, but her scores were still a bit higher than persons with mental retardation.

Eagle performed other tests, including a test for autism, which revealed that Samantha did not meet the criteria for either autism or an autistic spectrum disorder, which is another term for PDD. Although Eagle found that Samantha's communication score on the autism test "did reach the cut-off for autistic spectrum" because of her lack of emotional gestures and the frozen quality of her body language, "this likely can be explained by something other than autism." "It is perhaps a reflection of the chronic tension, and self-control, involved in trying to stay 'above water' in coping with underlying depression, confusion and anger." But Samantha's good verbal and social interaction skills disqualified her from a diagnosis of autistic spectrum

disorder and PDD. Eagle disagreed with Dushenko's diagnosis of PDD, and also found no evidence that Samantha had an expressive language disorder, but agreed with Dushenko's diagnosis of two learning disabilities: a mathematics disorder and a disorder of written expression. According to Eagle, the criteria in the DSM-IV-TR for PDD and ADHD are mutually exclusive, so a person cannot have a diagnosis of both ADHD and PDD; if a person has symptoms of both, the proper diagnosis is PDD.

According to the DSM-IV-TR, the category of PDD "should be used when there is a severe and pervasive impairment in the development of reciprocal social interaction associated with impairment in either verbal or nonverbal communication skills or with the presence of stereotyped behavior, interests, and activities, but the criteria are not met for a specific Pervasive Developmental Disorder, Schizophrenia, Schizotypal Personality Disorder, or Avoidant Personality Disorder. For example, this category [(PDD)] includes 'atypical autism'—presentations that do not meet the criteria for Autistic Disorder because of late age at onset, atypical symptomatology, or subthreshold symptomatology, or all of these." In rejecting the PDD diagnosis, Eagle's report stated that "Samantha does not appear to have a primary gross and sustained qualitative impairment in the capacity for reciprocal interaction. Her interaction and communication is not 'distinctly deviant.' She is quite good at conversation. Although she may not always take into account the other's perspective, she is able to be aware of it—and talk about it. She is capable of insight into the minds of others, and to some extent her own, although she does not always act upon it."

Eagle's report stated that, as measured by the Vineland tests, Samantha's adaptive functioning (that is, her difficulties with numerous life skills) "is for the most part in the range of mild mental retardation." In Eagle's opinion, Samantha's poor adaptive functioning was the result of her severe learning disabilities and exacerbated by her anxiety and depression. Eagle found Samantha's GAF to be 45. Eagle testified that the reference in her report to Samantha's adaptive functioning being in the range of mild mental retardation was not intended to mean that Samantha met the standard for services under the fifth category; it was not Eagle's job to determine eligibility for services.

Eagle diagnosed Samantha with ADHD-NOS, depressive disorder NOS, anxiety disorder NOS, and adjustment disorder. In Eagle's opinion, the causes of Samantha's problems and deficits were a combination of severe learning disabilities, compounded by psychiatric, emotional, and personality issues. According to the DSM-IV-TR, depression, anxiety, adjustment disorder, and ADD are psychiatric conditions.

Eagle also diagnosed Samantha with a "chronic (severe) adjustment disorder to the experience of her disabilities," which was best captured by the diagnostic manual's term, cognitive disorder NOS. Eagle also found that Samantha exhibited some features of personality disorder NOS, but it would not apply if those features were the result of some physiological or medical condition arising from her birth history. As explained in Eagle's report, many aspects of the definition of personality disorder "appear to describe Samantha. However, it cannot apply insofar as both her inner experience and behavior may be, at least in part, if not in large part, a function of some 'physiological' or medical condition, inferred on the basis of her birth history."

Eagle admitted that both she and Dushenko had a "strong hypothesis" that Samantha's birth history affected her brain and that this hypothesis was consistent with Samantha's history and test results. Eagle also testified that "a description of a neurocognitive disorder . . . seems to fill in some of the gaps that maybe are left by just diagnosing LD [(learning disabilities)] and attention deficit, but I won't say that conclusively. It's a possibility." As Eagle stated in her report: "Samantha's learning disabilities may be subsumed under an attention deficit disorder. She also has a learning disorder of written expression and a math learning disability. If, as hypothesized, these disabilities do, in fact, stem from pre-natal complications, prematurity and hypoxia, they might all be subsumed under a diagnosis of Cognitive Disorder Not Otherwise Specified, indicating that they are secondary to a medical condition."

Eagle's report further explained that "[d]espite overall normal intelligence, and indications of some creative potential, Samantha is very significantly impaired in adaptive skills. She appears to have severe primary learning disabilities, most likely the result of pre-maturity and pre-natal and peri-natal complications. Her learning difficulties have been evident since early childhood, and are associated with emotional difficulties. Together, these difficulties appear to be paralyzing her in relation to meeting the challenges of adulthood. In coping with her disabilities, she relies heavily on denial and . . . unrealistic fantasies about her capabilities and about solutions to her problems. She is creating within and around herself an atmosphere of frustration and despair."

Eagle also noted that "it will be difficult to find an appropriate 'peer' group for Samantha in any treatment, residential, or vocational milieu. She is far too intelligent to be with people with serious intellectual deficits. At the same time, she is not psychotic and would be ill-placed with mentally ill, more acutely disturbed individuals." Eagle recommended supportive counseling, tutoring, vocational training, a job coach, and perhaps medication, if paired with therapy.

Although Eagle was not on the HRC eligibility team that evaluated Samantha for HRC services in 2006, Eagle attended the meeting and presented her report to the team members. In connection with Eagle's assessment of Samantha's cognitive and adaptive functioning, she was provided with guidelines for determining fifth category eligibility established by the Association of Regional Center Agencies (ARCA), a trade organization for the regional centers. The ARCA guidelines stated that eligibility for services under the fifth category "requires a determination as to whether an individual functions in a manner that is similar to that of a person with mental retardation OR requires treatment similar to that required by individuals with mental retardation." Under the ARCA guidelines, a person is considered to be functioning in a manner similar to a person with mental retardation if the "general intellectual functioning is in the low borderline range of intelligence (I.Q. scores ranging from 70–74.)" As to whether a person requires similar treatment to that required by persons with mental retardation, the ARCA guidelines state that "the team should consider *the nature of training and intervention* that is most appropriate for the individual who has global cognitive deficits."

### 4. *Maureen Saunders, M.D.*

Maureen Saunders, M.D., a psychiatrist at Kaiser Permanente, first treated Samantha in November 2005; Samantha was already taking Adderall for ADD. Saunders continued her prescription for Adderall. Both ADD and ADHD are considered psychiatric disorders. Saunders agreed with Eagle's diagnoses and believed that Samantha did not have mental retardation. Saunders also agreed with Dushenko's diagnosis of dysthymia, but disagreed that Samantha had a personality disorder. Another Kaiser doctor felt that Samantha did not meet the criteria for autistic spectrum disorder. Saunders admitted that Samantha did not exhibit repetitive behaviors, one of the aspects of autistic spectrum disorder.

### 5. *HRC Eligibility Team*

A member of HRC's eligibility team testified at the administrative hearing that HRC considers an IQ score of between 70 and 75 (a score in the borderline range of mental retardation) to qualify a person for eligibility for services under the fifth category in section 4512(a). The team did not believe that Samantha qualified under the fifth category, notwithstanding her significant impairments in adaptive functioning, because of her relatively high level of intellectual functioning and the nature of the services she would need. The services needed by Samantha, although in the same general category of the services provided to those with mental retardation, would be qualitatively different from those required by a person with mental retardation. The

persons providing the services to Samantha would need a different expertise than the persons providing services to those with mental retardation.

The eligibility team did not consider ADHD a developmental disability; it is considered psychiatric. The team considered Samantha's disabilities to be learning disabilities and psychiatric disabilities, which are excluded under the regulations. To the extent that Samantha had a personality disorder, the support services required by those with personality disorders are different than the services required by those with mental retardation. The team was of the opinion that Samantha would not thrive in an environment with persons with mild to moderate mental retardation.

### 6. *Katie Hornberger*

Katie Hornberger, an attorney and advocate for people with developmental disabilities, including some with fifth category eligibility, testified regarding the treatment needs of persons with mental retardation and with conditions requiring treatment similar to that required by persons with mental retardation. According to Hornberger, because a person, once found eligible for services under the Lanterman Act, is provided with an individualized treatment plan, "everyone's going to have a different kind of bundle of services," and no one would receive all of the same services. But the types of services provided are "typically not" different "between people with mental retardation and people under the fifth category."

Hornberger's clients with mental retardation and those clients found eligible under the fifth category both had the following treatment needs: (1) self-help and independent living skill training, including cooking, cleaning, money management, and public transportation use; (2) service coordination and management; (3) information and referral services; (4) special education and related services for those under age 21; (5) generic or special social or recreational services; (6) generic or special rehabilitative or vocational training; (7) specialized residential care or supported living services for those not living with family; (8) supported employment; (9) supported or semi-independent living arrangements; (10) day activity program services for those who do not work; (11) mobility training, including transportation education; (12) specialized skill development teaching methods; (13) behavioral training and behavior modification programs; (14) financial oversight, reading, and writing support services; and (15) publications that translate complex information into manageable units.

## C. *ALJ's Decision*

Based on the foregoing reports and testimony, the ALJ concluded that Samantha was not eligible for HRC services because she did not meet her

burden of establishing that she had a condition closely related to mental retardation or that required treatment similar to that required for mental retardation. The ALJ noted that the experts agreed that Samantha fell within the average range of intelligence, with IQ scores of 90 and 99; that she suffered from learning disabilities; that she suffered from ADD/ADHD; that she suffered from depression; and that she was substantially impaired in her adaptive functioning. The ALJ noted that the learning disabilities alone, and the psychiatric disorders alone (depression and ADD/ADHD), were excluded from regional center eligibility. Although the experts disagreed as to nature of Samantha's underlying disability, the ALJ found that none of their diagnoses qualified her for services.

The ALJ did not find credible Dushenko's diagnosis of PDD because Dushenko did not conduct an autism test, and there was insufficient proof that Samantha had autism. Although the ALJ found Eagle's diagnoses (cognitive disorder NOS, ADD/ADHD, depression, possible personality disorder, and learning disabilities) to be more plausible, none of these conditions met the eligibility criteria. The ALJ concluded that Samantha's "disabling condition, and consequent impairments in adaptive functioning, are most closely related to learning disabilities or psychiatric problems. Under [regulation 54000(c)], these conditions are excluded from the definition of handicapping conditions only if they are the only diagnosed conditions. [These conditions] would not preclude her from qualifying for Regional Center supports and services, if [Samantha] suffers from a developmental disability, in addition to a psychiatric disorder and a learning disorder. [Samantha] did not establish she suffers from a qualifying developmental disability. [¶] . . . [¶] . . . Her low adaptive functioning scores, without any other qualifying disability, [do] not justify a finding that [Samantha] suffers from a condition similar to mental retardation or requiring treatment similar to mental retardation."

Citing the DSM-IV-TR, the ALJ's decision states: "The essential feature of Mental Retardation is significantly sub average general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). . . . [¶] . . . Significantly sub average intellectual functioning is defined as an IQ of about 70 or below (approximately 2 standard deviations below the mean). . . . [¶] . . . Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting. . . ."

The ALJ also found that Samantha's treatment needs were "not identical or substantially similar to" the needs of a person with mental retardation. "Her day program needs would be different. A day program for individuals with mental retardation would involve a different type of training, strategy, and a different task breakdown than would be required for an individual with a higher level of intellectual functioning, such as [Samantha] whose intelligence is two standard deviations higher. Individuals with mental retardation are generally trained in a group setting, while [Samantha] does not require that setting. Individuals with mental retardation are often trained for repetitive type jobs, while [Samantha] is capable of more varied work, such as the pre-school where she interns. Individuals with mental retardation socialize with others at their cognitively impaired level, and have day programs with that in mind. In contrast, [Samantha] prefers to socialize with adults. Individuals with mental retardation typically live in a group home, while [Samantha] is capable of more living semi-independently with structure. Dr. Eagle is emphatic that [Samantha] does not belong with any individuals with mental retardation, as her level of intellectual functioning is too high. Dr. Eagle is clear that she feels it would be a disservice for [Samantha] to be placed with a group of individuals who have mental retardation. This testimony was credible."

### D. *Trial Court's Decision*

In the superior court, Samantha filed a petition for a writ of mandate challenging the denial of services under section 4512(a) and a complaint for declaratory relief challenging the validity of regulation 54000(c)(1) and (2) as inconsistent with sections 4512(a) and 4640, subdivision (b). After a hearing, the trial court issued a detailed written ruling upholding the validity of the regulations and denying Samantha's petition for a writ of mandate.

With respect to the petition for a writ of mandate, the trial court stated: "An independent review of the evidence supports a finding that Samantha's disabilities were caused by conditions excluded under Regulation 54000 from qualifying developmental disabilities." The trial court found Dushenko's diagnosis of PDD not to be credible because Dr. Eagle refuted it by testifying that PDD is the equivalent of autistic spectrum disorder, and testing showed that Samantha did not meet the requirements for autistic spectrum disorder. The trial court concluded that Dr. Eagle's diagnoses showed that "Samantha's condition does not fall within one of the five categories meeting the developmental disability definition and [regulation 54000]." The trial court found that Samantha's disabling conditions were not closely related to mental retardation and also reached the same conclusion as the ALJ on the issue of whether Samantha required treatment similar to that required for persons with mental retardation.

Samantha appealed from the judgment denying her petition for a writ of mandate and denying declaratory relief.

## DISCUSSION

A. *Validity of Regulation 54000(c)(1) and (2)*

1. *Principles of Review*

Samantha seeks a declaration that regulation 54000(c)(1) and (2) are invalid as inconsistent with the definition of "developmental disability" in section 4512(a) and with the provisions of section 4640, subdivision (b).[3] She maintains that the regulations exclude "classes of persons who . . . otherwise might be eligible, and completely failed to modify the Fifth Category to include conditions related to autism." We conclude that the foregoing regulations are valid because they are consistent with section 4512(a)'s authorizing DDS to adopt regulations to further define the term "developmental disability," which the regulations reasonably do.

"Government Code section 11342.2 provides the general standard of review for determining the validity of administrative regulations. That section states that '[w]henever by the express or implied terms of any statute a state agency has authority to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, no regulation adopted is valid or effective unless [1] consistent and not in conflict with the statute and [2] reasonably necessary to effectuate the purpose of the statute.' " (*Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 108 [126 Cal.Rptr.2d 441], fn. omitted (*Communities*).)

■ The standard of consistency in Government Code section 11342.2 means "being in harmony with, and not in conflict with or contradictory to, existing statutes, court decisions, or other provisions of law." (Gov. Code, § 11349, subd. (d).)

With respect to the consistency requirement, "the judiciary independently reviews the administrative regulation for consistency with controlling law. The question is whether the regulation alters or amends the governing statute

---

[3] Section 4640, subdivision (b) provides: "In order to ensure uniformity in the application of the definition of developmental disability contained in this division, the Director of Developmental Services shall, by March 1, 1977, issue regulations that delineate, by diagnostic category and degree of disability, those persons who are eligible for services and supports by regional centers. In issuing the regulations, the director shall invite and consider the views of regional center contracting agencies, the state council, and persons with a demonstrated and direct interest in developmental disabilities."

or case law, or enlarges or impairs its scope. In short, the question is whether the regulation is within the scope of the authority conferred; if it is not, it is void. This is a question particularly suited for the judiciary as the final arbiter of the law, and does not invade the technical expertise of the agency." (*Communities, supra,* 103 Cal.App.4th at pp. 108–109, fns. omitted.) "By contrast, the second prong of this standard, reasonable necessity, generally does implicate the agency's expertise . . . ." (*Id.* at p. 109; see *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha*).)

"In deciding whether the regulation conflicts with its legislative mandate, the court does not defer to the agency's interpretation of the law under which the regulation issued, but rather exercises its own independent judgment. (See *Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 110[5], fn. 7 [56 Cal.Rptr.3d 880, 155 P.3d 284] ['[w]hile the [agency's] construction of a statute is entitled to consideration and respect, it is not binding and it is ultimately for the judiciary to interpret this statute']; *Yamaha,* [*supra,* 19 Cal.4th] at p. 11, fn. 4 ['[t]he court, not the agency, has "final responsibility for the interpretation of the law" under which the regulation was issued']; see also *California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 11 [270 Cal.Rptr. 796, 793 P.2d 2] [' "[a]dministrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to strike down such regulations" '].)" (*Aguiar v. Superior Court* (2009) 170 Cal.App.4th 313, 323 [87 Cal.Rptr.3d 813].) "Courts must, in short, independently judge the text of the statute, taking into account and respecting the agency's interpretation of its meaning, of course, whether embodied in a formal rule or less formal representation. Where the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools available to the court. Depending on the context, it may be helpful, enlightening, even convincing. It may sometimes be of little worth." (*Yamaha, supra,* 19 Cal.4th at pp. 7–8.)

■ "Courts have long recognized that the Legislature may elect to defer to and rely upon the expertise of administrative agencies [citations]." (*Credit Ins. Gen. Agents Assn. v. Payne* (1976) 16 Cal.3d 651, 656 [128 Cal.Rptr. 881, 547 P.2d 993].) "Under this standard of review, even though an enabling statute authorizes only '. . . such reasonable rules and regulations as may be *necessary* . . .' [citation] a court should seek not to determine whether the challenged regulation is strictly 'necessary.' Instead it must ascertain whether the agency reasonably interpreted its power in deciding that the regulation was necessary to accomplish the purpose of the statute. Stated another way, the court's role is limited to determining whether the regulation is 'reasonably designed to aid a statutory objective.' [Citations.]" (*Id.* at p. 657.) Accordingly, " 'the court will defer to the agency's expertise and will not "superimpose its own policy judgment upon the agency in the absence of an

arbitrary and capricious decision." [Citation.]' [Citations.]" (*Ford Dealers Assn. v. Department of Motor Vehicles* (1982) 32 Cal.3d 347, 355 [185 Cal.Rptr. 453, 650 P.2d 328].) Appellant has the burden of establishing the invalidity of regulation 54000(c)(1) and (2). (See *Credit Ins. Gen. Agents Assn. v. Payne, supra*, 16 Cal.3d at p. 657.)

### 2. *Statutory Framework*

In 1977, the California Legislature enacted the Lanterman Act to provide individuals with developmental disabilities, who were previously placed in state hospitals, with the opportunity to be housed and treated in less restrictive community settings. (*Clemente v. Amundson* (1998) 60 Cal.App.4th 1094, 1097 [70 Cal.Rptr.2d 645].) The Lanterman Act is a comprehensive statutory scheme "to provide facilities and services to meet the needs of those with developmental disabilities, regardless of age or degree of handicap. 'Such services include locating persons with developmental disabilities (§ 4641); assessing their needs (§§ 4642–4643); and, on an individual basis, selecting and providing services to meet such needs (§§ 4646–4647). The purpose of the statutory scheme is twofold: to prevent or minimize the institutionalization of developmentally disabled persons and their dislocation from family and community (§§ 4501, 4509, 4685), and to enable them to approximate the pattern of everyday living of nondisabled persons of the same age and to lead more independent and productive lives in the community (§§ 4501, 4750–4751).' " (*Mason, supra*, 89 Cal.App.4th at p. 1125, fn. omitted.)

"The Legislature has fashioned a system involving both state agencies, such as the DDS, and private entities, such as [regional centers], . . . to implement the Lanterman Act's scheme of statutory rights of developmentally disabled persons. The DDS, a state agency, 'has jurisdiction over the execution of the laws relating to the care, custody, and treatment of developmentally disabled persons.' The regional centers, 'operated by private nonprofit community agencies under contract with the DDS, are charged with providing developmentally disabled persons with "access to the facilities and services best suited to them throughout their lifetime." ' This includes determining eligibility and providing services to developmentally disabled persons. California DDS administrative regulations provide guidance in implementing the Lanterman Act. The regulations define in greater detail what is considered a developmental disability and state that the [regional centers] . . . shall determine whether an individual is developmentally disabled." (*Mason, supra*, 89 Cal.App.4th at pp. 1125–1126, fns. omitted.)

In *Mason*, the Court of Appeal rejected a challenge to section 4512(a)'s fifth category as unconstitutionally vague. The court explained as follows: "In determining whether section 4512(a)'s fifth category of developmental disability is impermissibly vague, we must take into account the Legislature's

intent to defer to the DDS and [the regional centers] the implementation of the Lanterman Act. Here, the Lanterman Act delegated to the DDS authority to oversee the [regional center's] assessment of eligibility and provision of services to the developmentally disabled. Thus, the standard in section 4512 for determining whether a person is developmentally disabled 'need be sufficiently definite only to provide directives of conduct for the administrative body in exercising its delegated administrative or regulatory powers.' [¶] . . . [¶] . . . This standard applies in the instant case since the Legislature has delegated to the DDS and [the regional centers] the responsibility for assessing eligibility and providing services to the developmentally disabled." (*Mason, supra*, 89 Cal.App.4th at pp. 1127–1128, fns. omitted.)

■ The court in *Mason* acknowledged that the statutory language "closely related to" and "treatment similar to" (§ 4512(a); see, *ante*, fn. 1) is general and somewhat imprecise. "However, section 4512(a) does not exist, and we do not apply it, in isolation. '[W]here the language of a statute fails to provide an objective standard by which conduct can be judged, the required specificity may nonetheless be provided by the common knowledge and understanding of members of the particular vocation or profession to which the statute applies.' ■ Here, the Lanterman Act and implementing regulations clearly defer to the expertise of the DDS and [regional center] professionals and their determination as to whether an individual is developmentally disabled. General, as well as specific guidelines are provided in the Lanterman Act and regulations to assist such [regional center] professionals in making this difficult, complex determination. Some degree of generality and, hence, vagueness is thus tolerable." (*Mason, supra*, 89 Cal.App.4th at pp. 1128–1129, fn. omitted.)

The court in *Mason* concluded that "section 4512(a) is sufficiently precise, when considered in conjunction with the entire provision defining 'developmental disability' and the implementing regulations, which provide additional guidance on what is considered a developmental disorder. Determination of developmental disability under the fifth category does not depend on a completely subjective standard. It does not contain a broad invitation to subjective or discriminatory enforcement. Rather, it requires a determination as to whether an individual's condition is substantially similar to that of mental retardation. And '[t]he term "mental retardation" has a "demonstrably established technical meaning" [citation] which basic definition remains well recognized [citation]; the term is not unconstitutionally vague.' " (*Mason, supra*, 89 Cal.App.4th at p. 1129.)

■ With respect to the fifth category, the *Mason* court determined that section 4512(a) "does not allow such subjectivity and unbridled discretion as to render section 4512 impermissibly vague. The fifth category condition

must be very similar to mental retardation, with many of the same, or close to the same, factors required in classifying a person as mentally retarded. Furthermore, the various additional factors required in designating an individual developmentally disabled and substantially handicapped must apply as well. [¶] While there is some subjectivity involved in determining whether the condition is substantially similar to mental retardation and requires similar treatment, it is not enough to render the statute unconstitutionally vague, particularly when developmental disabilities are widely differing and difficult to define with precision. Section 4512 and the implementing regulations prescribe an adequate standard or policy directive for the guidance of the [regional centers] in their determinations of eligibility for services." (*Mason, supra,* 89 Cal.App.4th at pp. 1129–1130.) Accordingly, "it appears that it was the intent of those enacting the Lanterman Act and its implementing regulations not to provide a detailed definition of 'developmental disability' so as to allow greater deference to the [regional center] professionals in determining who should qualify as developmentally disabled and to allow some flexibility in determining eligibility so as not to rule out eligibility of individuals with unanticipated conditions, who might need services." (*Mason,* at p. 1129.)

We conclude, as did *Mason,* that the Legislature crafted section 4512(a) with the intention of providing DDS with flexibility in adopting regulations. In 1980, DDS promulgated the challenged regulation 54000(c), which, as pertinent here, *excludes* from the definition of developmental disability "[s]olely psychiatric disorders where there is impaired intellectual or social functioning which originated as a result of the psychiatric disorder or treatment given for such a disorder" (reg. 54000(c)(1)) and "[s]olely learning disabilities" (reg. 54000(c)(2)).[4]

### 3. *Construction of Section 4512(a)*

■ We must give section 4512(a) a reasonable construction which conforms to the expressed purpose and intention of the Legislature. (*Association for Retarded Citizens v. Department of Developmental Services* (1985) 38 Cal.3d 384, 393 [211 Cal.Rptr. 758, 696 P.2d 150].) Section 4512(a) authorizes the director of DDS to define the term "developmental disability," but the statute specifies that the term must comply with certain requirements: that the disability originate before age 18, that it continue, or can be expected to

---

[4] Regulation 54000(c)(3) is not at issue on this appeal. This provision excludes from the definition of developmental disability a handicapping condition that is "[s]olely physical in nature. These conditions include congenital anomalies or conditions acquired through disease, accident, or faulty development which are not associated with a neurological impairment that results in a need for treatment similar to that required for mental retardation."

continue, indefinitely, that it constitute a substantial disability for the individual,[5] that the term include mental retardation, cerebral palsy, epilepsy, autism, and disabling conditions closely related to mental retardation or to require similar treatment, but not handicapping conditions that are solely physical.

■ According to Samantha, the only statutory limitations or exceptions are those specified in the statute: that the developmental disability (1) originate before age 18, (2) be likely to continue indefinitely, (3) constitute a substantial disability for the individual, and (4) not be solely physical in nature. To support this contention, Samantha relies on the principle that the expression of one thing in a statute ordinarily implies the exclusion of other things (*expressio unius est exclusio alterius*). But this rule does not apply if there is a discernible and contrary legislative intent. (*In re J. W.* (2002) 29 Cal.4th 200, 209 [126 Cal.Rptr.2d 897, 57 P.3d 363].) Here, the unambiguous language of section 4512(a) evinces such a contrary intent. The statute directs DDS to further define the term "developmental disability," and requires that the term include disabling conditions found to be closely related to mental retardation or to require similar treatment (that is, the fifth category). As noted in *Mason*, developmental disabilities differ widely and are difficult to define with precision. (*Mason, supra*, 89 Cal.App.4th at p. 1130.) Thus, section 4512(a) was drafted to provide flexibility to afford deference to the professionals to determine the scope of the term "developmental disability."

Accordingly, the only reasonable construction of section 4512(a) is that DDS is authorized to promulgate regulations to define further the term "developmental disability," including regulations to delineate further the fifth category.

■ We also reject Samantha's argument that adaptive functioning impairment alone is sufficient for eligibility under the fifth category. The first sentence of section 4512(a) includes a definition of "developmental disability," that requires that the disability constitute a "substantial disability for that individual." Section 4512, subdivision (*l*) contains a definition of "substantial disability" (see, *ante*, fn. 5) that encompasses the concept of adaptive functioning impairment. The fifth category is limited to disabling conditions closely related to mental retardation or requiring similar treatment. Mental retardation, as defined in the DSM-IV-TR and by the ALJ, includes both a cognitive element and an adaptive functioning element. To interpret fifth

---

[5] Section 4512, subdivision (*l*) defines " '[s]ubstantial disability' " as "the existence of significant functional limitations in three or more of the following areas of major life activity, as determined by a regional center, and as appropriate to the age of the person: [¶] (1) Self-care. [¶] (2) Receptive and expressive language. [¶] (3) Learning. [¶] (4) Mobility. [¶] (5) Self-direction. [¶] (6) Capacity for independent living. [¶] (7) Economic self-sufficiency."

category eligibility as including *only* an adaptive functioning element (already required by the first sentence of § 4512(a)), is contrary to principles of statutory construction because it renders superfluous the statutory language limiting the fifth category to disabling conditions "closely related to mental retardation or to require treatment similar to that required for individuals with mental retardation." ■ Samantha's interpretation of section 4512(a) thus runs afoul of the principle that every part of a statute is to be given significance, and a construction rendering some words surplusage is to be avoided. (*McCarther v. Pacific Telesis Group* (2010) 48 Cal.4th 104, 110 [105 Cal.Rptr.3d 404, 225 P.3d 538].)

Samantha makes two additional arguments regarding the scope of section 4512(a), and the rulemaking authority of DDS, based on recent enactments in the Penal Code and on the legislative history of the predecessor statute to section 4512(a), which contains references to the definition of "developmental disability" under a former federal statute.

Without citation of pertinent authority, Samantha maintains that section 4512(a) must be harmonized with Penal Code sections 1001.20 and 1376, which contain definitions of "mental retardation."[6] According to Samantha, regulation 54000(c)(1) and (2) also must be consistent with those Penal Code provisions. In her view, the Penal Code provisions provide a broader definition of developmental disability than does section 4512(a), and section 4512(a) must be read to be consistent with the Penal Code provisions; thus, the regulations improperly narrow the scope of section 4512(a).

But Samantha does not establish that the express language or legislative history of either section 4512(a) or Penal Code section 1001.20 evidences an

---

[6] Penal Code section 1001.20, enacted in September 1980, is part of a chapter dealing with a diversion program for defendants with cognitive developmental disabilities. Penal Code section 1001.20, subdivision (a) provides: " 'Cognitive Developmental Disability' means any of the following: [¶] (1) 'Mental Retardation,' meaning a condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period. [¶] (2) 'Autism,' meaning a diagnosed condition of markedly abnormal or impaired development in social interaction, in communication, or in both, with a markedly restricted repertoire of activity and interests. [¶] (3) Disabling conditions found to be closely related to mental retardation or autism, or that require treatment similar to that required for individuals with mental retardation or autism, and that would qualify an individual for services provided under the Lanterman Developmental Disabilities Services Act."

After the United States Supreme Court barred execution of defendants with mental retardation in *Atkins v. Virginia* (2002) 536 U.S. 304, 321 [153 L.Ed.2d 335, 122 S.Ct. 2242], the California Legislature in 2003 enacted Penal Code section 1376 to afford a defendant in a death penalty case a "mental retardation hearing." Penal Code section 1376, subdivision (a) provides: "As used in this section, 'mentally retarded' means the condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before the age of 18."

intent to augment the definition of "developmental disability" under the Lanterman Act with the provisions of Penal Code section 1001.20. And the reference to the Lanterman Act in Penal Code section 1001.20, subdivision (a)(3) (see, *ante*, fn. 6) is insufficient to show that in enacting Penal Code section 1001.20, the Legislature intended to expand the Lanterman Act's definition of "developmental disability."

Further, Penal Code sections 1001.20 and 1376 deal with issues of punishment of defendants with mental retardation in the criminal justice system. Samantha does not establish that the purposes of the penal statutes are the same as the purposes of the Lanterman Act. Therefore, even if the definitions of certain terms under the Lanterman Act are different from the definitions in the Penal Code, no provision would be rendered nugatory if a person qualified under one statute but not another. Because Samantha fails to show that the subject matter of either Penal Code section 1376 or 1001.20 is the same as the subject matter of section 4512(a), there is no basis to apply the rule of statutory construction requiring that statutes relating to the same subject be harmonized to the extent possible. (See *McCarther v. Pacific Telesis Group, supra*, 48 Cal.4th 104, 110.) In any event, section 4512(a), as the more specific statute, would prevail over the Penal Code provisions under the rule of construction by which the specific statute prevails over a more general one. (See *Garcia v. McCutchen* (1997) 16 Cal.4th 469, 478 [66 Cal.Rptr.2d 319, 940 P.2d 906].)

For the foregoing reasons, we conclude that Samantha misplaces reliance on *People v. Superior Court (Vidal)* (2007) 40 Cal.4th 999 [56 Cal.Rptr.3d 851, 155 P.3d 259] (*Vidal*), involving the issue of whether the trial court in a "mental retardation hearing" under Penal Code section 1376, applied the wrong legal standard in finding a defendant, Vidal, mentally retarded and ineligible for the death penalty. The trial court found that Vidal satisfied the statutory requirement for mental retardation, notwithstanding his full-scale IQ scores of 77 and 78 on the Wechsler intelligence test. Under that test, a full-scale IQ score below 70 generally indicates mental retardation. The trial court relied heavily on Vidal's very low scores (as low as 59) for verbal IQ and his severe lack of verbal ability. (*Vidal*, at p. 1007.)

In upholding the trial court's use of the verbal IQ subtest scores of 59 rather than the full-scale IQ scores of 77 and 78, the *Vidal* court explained: "The statute itself [(Pen. Code, § 1376)] makes no reference to one or another clinical test of intelligence, any more than it refers to a particular score as the cutoff for mental retardation. [Citation.] . . . To impose an absolute rule that a trial court's finding of mental retardation must be based primarily on the [Wechsler] Full Scale IQ scores would be to read into the statute a criterion the Legislature chose to omit and would be inconsistent with the principle

that a factual finding of retardation must be based on all the relevant evidence." (*Vidal, supra,* 40 Cal.4th at p. 1012.)

The court in *Vidal* concluded that "[t]he Legislature has mandated that trial courts, in determining mental retardation for *Atkins* purposes (*Atkins* [*v. Virginia*], *supra,* 536 U.S. 304), find whether the individual's 'general intellectual functioning' is significantly impaired (§ 1376, subd. (a)), but has not defined that phrase or mandated primacy for any particular measure of intellectual functioning. The question of how best to measure intellectual functioning in a given case is thus one of fact to be resolved in each case on the evidence, not by appellate promulgation of a new legal rule." (*Vidal, supra,* 40 Cal.4th at p. 1014.)

Samantha asserts that the legislative history of the predecessor statute to section 4512(a), Health and Safety Code former section 38010, subdivision (a), enacted in 1976, shows a legislative intent to broaden the definition of "developmental disability" to conform to the then existing federal definition of the term in the 1975 version of 42 United States Code former section 6001(7).[7] But the statutory definition of "developmental disability" enacted in California in 1976 (Health & Saf. Code, former § 38010, subd. (a)) did not track the language of the then existing federal law. Although an earlier version of the bill enacting Health and Safety Code former section 38010, subdivision (a) proposed language which tracked the federal statute, the provision as enacted by the Legislature did not contain language tracking the federal law; rather, the language adopted in Health and Safety Code former section 38010, subdivision (a) was substantially similar to that in section 4512(a). A former version of a bill which differs significantly from the version which is enacted is of little value on the issue of legislative intent.

---

[7] Health and Safety Code former section 38010, subdivision (a), provided: " 'Developmental disability' means a disability which originates before an individual attains age 18, continues, or can be expected to continue, indefinitely, and constitutes a substantial handicap for such individual. As defined by the Director of Health, in consultation with the Superintendent of Public Instruction, this term shall include mental retardation, cerebral palsy, epilepsy, and autism. This term shall also include handicapping conditions found to be closely related to mental retardation or to require treatment similar to that required for mentally retarded individuals, but shall not include other handicapping conditions that are solely physical in nature."

42 United States Code former section 6001(7) provided: "The term 'developmental disability' means a disability of a person which—[¶] (A)(i) is attributable to mental retardation, cerebral palsy, epilepsy, or autism; [¶] (ii) is attributable to any other condition of a person found to be closely related to mental retardation because such condition results in similar impairment of general intellectual functioning or adaptive behavior to that of mentally retarded persons or requires treatment and services similar to those required for such persons; or [¶] (iii) is attributable to dyslexia resulting from a disability described in clause (i) or (ii) of this subparagraph; [¶] (B) originates before such person attains age eighteen; [¶] (C) has continued or can be expected to continue indefinitely; and [¶] (D) constitutes a substantial handicap to such person's ability to function normally in society."

(*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1396 [241 Cal.Rptr. 67, 743 P.2d 1323] [unpassed bills, as evidence of legislative intent, have little value].) For the foregoing reasons, we conclude that Samantha's reliance on the legislative history of Health and Safety Code former section 38010, subdivision (a) is to no avail. Thus, Samantha fails to persuade us that section 4512(a), and DDS's rulemaking authority, are circumscribed by Penal Code section 1001.20 or 1376, or the federal definition of "developmental disability" set out in the 1975 federal statute.

We proceed to apply our construction of section 4512(a) to Samantha's claims that regulation 54000(c)(1) and (2) are invalid.

### 4. Analysis

Samantha asserts that regulation 54000(c)(1) and (2) are void because they are inconsistent with section 4512(a)'s definition of developmental disability. She maintains that the regulations impose limitations (that is, they exclude psychiatric disorders and learning disabilities) not permitted by the language of the statute. She also claims that the regulations impermissibly deny mental health services to those with developmental disabilities.

 As explained above, regulation 54000(c)(1) and (2) are the result of determinations by DDS professionals that psychiatric disorders alone and learning disabilities alone do not fall within the scope of the statutory "fifth category." Those regulations thus embody a technical determination within the area of expertise of DDS that psychiatric disorders alone and learning disabilities alone do not qualify as "disabling conditions found to be closely related to mental retardation or to require treatment similar to that required for individuals with mental retardation." (§ 4512(a).) By delineating the scope of the fifth category, the regulations comply with the directives in sections 4512(a) and 4640, subdivision (b) (see, *ante*, fns. 1 & 3).

Section 4640, subdivision (b) requires that the regulations delineate those eligible for services by diagnostic category and degree of disability. The foregoing regulations contain exclusions for specific diagnostic categories and degrees of disability: (1) "psychiatric disorders where there is impaired intellectual or social functioning"; and (2) a learning disability "which manifests as a significant discrepancy between estimated cognitive potential and actual level of educational performance." (Reg. 54000(c)(1), (2).)

 Samantha argues that the effect of the exclusion of *solely* psychiatric disorders and *solely* learning disabilities in the regulations renders "null and

void" the provisions in the Lanterman Act affording mental health services.[8] But the regulations govern the preliminary issue of whether a person has a qualifying developmental disability under the Lanterman Act; they do not address the issue of the specific services to be provided to those with developmental disabilities under the act. For example, a person with epilepsy who also had a learning disability or a psychiatric disorder would qualify for the full range of services under the Lanterman Act. Accordingly, the word "solely" in the regulations does not deny services to those persons with a qualifying condition under the Lanterman Act, but who also may have a learning disability or psychiatric disorder. The regulations therefore do not preclude mental health services to those persons with a qualifying developmental disability under section 4512(a). Thus, Samantha fails to establish that the regulations impair the provisions of the Lanterman Act affording mental health services.

Samantha's challenges to the scope of the fifth category under section 4512(a) also raise the factual issue of whether the conditions excluded by regulation 54000(c)(1) and (2) are closely related to mental retardation or require similar treatment. The regulations embody a determination that the exclusions therein *do not* constitute conditions closely related to mental retardation or that require similar treatment, and are thus excluded under provisions of section 4512(a). This determination implicates the agency's expertise and is entitled to a deferential standard of review. "The question is whether the agency's action was arbitrary, capricious, or without reasonable or rational basis." (*Communities, supra*, 103 Cal.App.4th at p. 109.) Samantha offered no evidence on this point below and thus fails to meet her burden of establishing that the regulations are arbitrary, capricious, or without a reasonable or rational basis. The trial court properly denied Samantha's request for declaratory relief.

Having concluded that Samantha has not met her burden of showing that regulation 54000(c)(1) and (2) are invalid, we proceed to address her contentions regarding the sufficiency of the evidence supporting the trial court's finding that she did not meet the requirements for eligibility for services under the fifth category.

---

[8] Subdivision (b) of section 4512 describes the services and supports to be provided for persons with developmental disabilities and provides in pertinent part: "Services and supports listed in the individual program plan may include, but are not limited to, . . . mental health services . . . ."

## B. Sufficiency of the Evidence

### 1. Standard of Review

"In reviewing an administrative agency decision, the trial court is required to exercise its independent judgment on the evidence presented in the administrative hearing and determine whether the weight of the evidence supports the agency's decision, 'which comes to the courts with a "strong presumption of correctness." ' '[T]he party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence.' On appeal, our task is to determine whether the trial court's findings are supported by substantial evidence." (*Mason, supra*, 89 Cal.App.4th at p. 1130, fns. omitted.)

### 2. Analysis

 A person may qualify for services under the fifth category in two ways: (1) a person may have a disabling condition closely related to mental retardation; or (2) a person may have a disabling condition that requires treatment similar to that required for individuals with mental retardation. (§ 4512(a).)

The trial court's finding that Samantha is not eligible for services under the fifth category is not supported by substantial evidence because there is insufficient evidence to support the conclusion that Samantha does not meet the second basis for fifth category eligibility, namely a disabling condition requiring treatment similar to that required by persons with mental retardation.

The evidence was overwhelming that Samantha had a disabling condition. Samantha's mother testified that at the time of Samantha's birth, doctors told her that Samantha had been deprived of oxygen for about 30 minutes and that such deprivation can cause some brain damage and eyesight problems. Samantha's mother also testified that Samantha exhibited behavioral problems at age two and that Samantha was always placed in special education classes in school. Both Dushenko and Eagle concluded that, based on Samantha's GAF score of 45, Samantha had major impairments in adaptive functioning. Eagle's report characterized Samantha's functioning as in the range of someone who had mild mental retardation. Eagle admitted that both she and Dushenko had a "strong hypothesis" that the oxygen deprivation at birth affected Samantha's brain and that the existence of a neurocognitive disorder explained Samantha's condition more fully than a diagnosis of learning disabilities and ADD. Although Eagle was unable to state conclusively that Samantha had a neurocognitive disorder as a result of birth

hypoxia, Eagle's report stated that if Samantha's disabilities stemmed from birth complications and hypoxia, "they might all be subsumed under a diagnosis of Cognitive Disorder Not Otherwise Specified, indicating that they are secondary to a medical condition."

The only reasonable inference on the record is that Samantha suffered birth injuries which affected her brain and that her cognitive disabilities and adaptive functioning deficits stem, wholly or in part, from such birth injuries. Samantha thus has a "disabling condition" within the meaning of the fifth category. As Samantha's condition is not "solely physical in nature," she is not excluded from Lanterman Act eligibility by the provision in section 4512(a), which excludes "handicapping conditions that are solely physical in nature." Nor does Samantha fall within the exclusions in regulation 54000(c), which exclude from the definition of developmental disability "psychiatric disorders where there is impaired intellectual or social functioning which originated as a result of the psychiatric disorder" or its treatment. The evidence established that Samantha's impaired intellectual and social functioning originated in early childhood and resulted from a hypoxic birth episode. There was no substantial evidence that her disabilities "originated as a result of the psychiatric disorder or treatment given for such a disorder." (Reg. 54000(c)(1).) And the experts all agreed that Samantha did not suffer *solely* from learning disabilities, thus making inapplicable regulation 54000(c)(2). (See, *ante*, fn. 2.)

As the only reasonable conclusion from the record is that Samantha has a disabling condition which is not excluded by either section 4512(a) or regulation 54000(c), we turn to the issue of whether Samantha requires treatment similar to that required for individuals with mental retardation. Because the only reasonable inference from the evidence is that Samantha's disabling condition requires treatment similar to the treatment needs of individuals with mental retardation, we conclude that the evidence is insufficient to support the trial court's finding to the contrary.

Hornberger testified at great length that her clients with mental retardation and with fifth category eligibility both needed many of the same kinds of treatment, such as services providing help with cooking, public transportation, money management, rehabilitative and vocational training, independent living skills training, specialized teaching and skill development approaches, and supported employment services. The testimony was undisputed that Samantha needed all of these types of treatment.

In its respondent's brief, HRC maintains that the following evidence supports the trial court's ineligibility finding: (1) an HRC eligibility team member testified that Samantha required services geared toward those with

psychological or mental health problems and not geared toward mentally retarded individuals; (2) Eagle testified that Samantha was too intelligent to be placed with those with mental retardation, and Samantha herself did not want to live in an independent living facility where the functioning of the clients was lower than hers; and (3) Hornberger testified that "mentally retarded individuals and learning disabled individuals have distinct modes of learning and that, therefore, educational services for these distinct groups require different strategies."

■ The foregoing evidence does not establish that Samantha does not require treatment similar to that required for an individual with mental retardation. The HRC team member's testimony that Samantha needed psychological or mental health services and Eagle's testimony that Samantha was too intelligent to be among those with mental retardation do not disqualify Samantha from fifth category eligibility because persons who are eligible for Lanterman Act services obtain an individualized treatment plan. There is no requirement that Samantha receive treatment—for example, independent living skills training—in the same program as individuals with mental retardation. And a need for psychological or mental health services does not disqualify a person from fifth category eligibility if the person is otherwise eligible. (See also Discussion, pt. A.4., *ante.*)

■ Hornberger's testimony that mentally retarded individuals need different educational strategies than those with learning disabilities does not support the conclusion that Samantha is ineligible for services under the fifth category. As set out in section 4512(a), fifth category eligibility depends on the similarity in the *treatment* required for an individual with a disabling condition and individuals with mental retardation. The statute does not require similarity in the educational or teaching methods. Even among the class of those individuals with mental retardation, there may be some individuals who are capable of learning to a greater extent than others, or who require different educational and teaching strategies. Because educational and teaching methods may differ even among those with mental retardation, the fifth category does not require similar educational or teaching methods, but rather similar types of treatment, such as independent living skills training. As Hornberger's testimony regarding the treatment needs of individuals with mental retardation and individuals qualifying under the fifth category was undisputed, the only reasonable inference to be drawn from this record is that Samantha required treatment similar to that required by individuals with mental retardation. Samantha is thus eligible for services under the second prong of the fifth category.

## DISPOSITION

That part of the judgment denying the complaint for declaratory relief is affirmed. That part of the judgment denying the petition for a writ of mandate is reversed, and on remand the trial court is directed to enter judgment granting the petition for a writ of mandate and directing issuance of (1) a writ of mandate requiring the State Department of Developmental Services to set aside its decision adopting the decision of the administrative law judge and to issue a new decision finding that Samantha C. is developmentally disabled within the meaning of Welfare and Institutions Code section 4512(a), and (2) a writ of mandate requiring Harbor Regional Center to provide services to Samantha C. pursuant to the Lanterman Developmental Disabilities Services Act. In the interests of justice, the parties are to bear their own costs on appeal.

Chaney, J., and Johnson, J., concurred.